# THE STATE OF NEW HAMPSHIRE

## SUPREME COURT

**In Case No. 2016-0328, <u>David Eldridge & a. v. Ocwen Loan Servicing, LLC & a.</u>, the court on October 12, 2017, issued the following order:**

Having considered the briefs and oral arguments of the parties, the court concludes that a formal written opinion is unnecessary in this case.

The plaintiffs, David Eldridge and Mary Ellen McNeill, appeal orders of the Superior Court (<u>Colburn</u>, J.) granting summary judgment to defendant Ocwen Loan Servicing, LLC (Ocwen) and denying their motion to amend their complaint to add claims against defendants The Rolling Green at Whip-Poor-Will Condominium Owners' Association (COA) and The Rolling Green at Whip-Poor-Will Condominium Townhouse Owners' Association (TOA) (collectively, the Associations). The Associations cross-appeal, asserting that the trial court should have granted them summary judgment on the basis of res judicata and should have awarded them attorney's fees. We affirm in part, reverse in part, and remand for further proceedings.

The following facts are recited in the trial court's orders or appear on the record before us. On September 25, 2004, the plaintiffs granted a mortgage to New Century Mortgage Corporation (New Century) on a townhouse unit (the Unit) they owned in the Whip-Poor-Will Condominium complex. New Century later assigned the mortgage to U.S. Bank N.A., for which Ocwen was the loan servicer. Section 9 of the mortgage provides, in part, that if the borrower fails to perform the covenants or agreements contained therein or if "there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under" the mortgage, "then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under" the mortgage.

From 2001 through 2009, the plaintiffs failed to pay all mandatory Association fees, and the Associations successfully sued them for the outstanding dues (the Assessment Action). Thereafter, the COA's board of directors voted to cancel the plaintiffs' common area privileges, and sought an injunction to enforce the cancellation of privileges. Meanwhile, a writ of execution issued in the Assessment Action and, on November 3, 2011, a sheriff's sale was conducted, at which the COA purchased the Unit, subject to the plaintiffs' one-year right of redemption.

On January 6, 2012, the Associations informed Ocwen that the COA had purchased the Unit and had terminated the plaintiffs' common area privileges. Ocwen expressed interest in paying off the outstanding assessments and inquired as to the amount owed. The Associations provided Ocwen with a quote, consisting of unpaid dues and late fees, plus attorney's fees the Associations had incurred to date, that totaled $43,443.08 (the Quoted Amount).

Simultaneously, however, the Associations were also negotiating with the plaintiffs to reach what the trial court termed a "global resolution." On March 21, 2012, the plaintiffs and the Associations executed a stipulated agreement (Stipulated Agreement) that obligated the plaintiffs to pay outstanding condominium fees totaling $3,204.52. The trial court approved the Stipulated Agreement on March 30, 2012.

Two days prior to approval of the Stipulated Agreement, Ocwen sent the Associations full payment of the Quoted Amount, thereby redeeming the Unit from the sheriff's sale. The mortgage provides that "[a]ny amounts disbursed by Lender" to protect its security interest as set forth in Section 9 "shall become additional debt of Borrower secured by this Security Instrument" and "shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment." Thus, the trial court presumed, and neither party now disputes, that "[a]t some point thereafter, Ocwen . . . added $43,443.08 to the plaintiffs' outstanding mortgage balance." A quitclaim deed to the plaintiffs, and a discharge and/or release of various liens, were executed on the Associations' behalf on April 16, 2012, and were recorded by the plaintiffs on May 7, 2012.

The plaintiffs suspected "that the $43,443.08 figure was grossly inflated," and, on May 16, 2012, they requested, through their attorney, "a breakdown of the $43,443.08 amount." They "were told that the Associations would address their request at [the Associations'] July meeting."

The plaintiffs subsequently filed a motion for contempt on the basis that the payment of $43,443.08 violated the Stipulated Agreement. On August 29, 2012, the Trial Court (Nicolosi, J.) denied the motion, apparently without prejudice, indicating that while the plaintiffs might have a separate cause of action if there had been an overpayment, she considered the case before her to be concluded.

On February 25, 2013, the plaintiffs' counsel reviewed accounting documents supplied by the Associations and concluded that the amount required to redeem the Unit "from the sheriff's sale should only have been about $13,000, which, when added with the $3,204.52 from the Stipulated Agreement, would only total $16,204.52, and not the $43,443.08 quoted by the Associations and subsequently paid by Ocwen." (Quotation and citations

2

omitted.)  He notified the Associations of the discrepancy, but "received no substantive response."

The plaintiffs brought this action against the defendants alleging breaches of fiduciary duty by both Ocwen and the Associations, and seeking both enforcement of the Stipulated Agreement and an accounting from the Associations.  Ocwen and the Associations moved separately for summary judgment.  The trial court granted summary judgment in favor of Ocwen, and in favor of the Associations with respect to the fiduciary duty and accounting claims, and dismissed, for failure to state a claim, the count seeking enforcement of the Stipulated Agreement.  On March 14, 2016, the plaintiffs moved to amend their complaint, which the trial court denied.  The trial court also denied the plaintiffs' motion for reconsideration.

On appeal, the plaintiffs argue that the trial court erred in: (1) finding, as a matter of law, that Ocwen did not owe the plaintiffs a fiduciary duty; (2) finding that the statute of limitations had run on new claims against the Associations that the plaintiffs sought to add, by amendment, to their complaint; and (3) denying their motion to amend "when the case was still open."  The Associations, on cross-appeal, contend that: (1) summary judgment in their favor should have been granted on the basis of res judicata; and (2) the trial court erred in denying their claim for attorneys' fees.

We first address the plaintiffs' challenge to the grant of summary judgment in Ocwen's favor, and we begin with our standard of review:

> In reviewing the trial court's grant of summary judgment, we consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the non-moving party.  If our review of that evidence discloses no genuine issue of material fact, and if the moving party is entitled to judgment as a matter of law, we will affirm the grant of summary judgment.  We review the trial court's application of the law to the facts de novo.

Pike v. Deutsche Bank Nat'l Trust Co., 168 N.H. 40, 42 (2015) (citations omitted).

The plaintiffs concede that, "ordinarily[,] . . . [t]he relationship between lender and borrower" is not a fiduciary one, but "is contractual under New Hampshire law."  Thus, as the trial court recognized, a tort claim "for purely economic or commercial losses associated with the contract relationship" is generally barred under the economic loss doctrine.  Wyle v. Lees, 162 N.H. 406, 410 (2011) (quotation omitted).  The plaintiffs contend, however, that they fall within a recognized exception to the economic loss doctrine.  Specifically, they "argue that there existed a special relationship between the plaintiffs and

[Ocwen] that created a duty owed by [Ocwen]." See id. (noting that "economic loss recovery may be permitted" when there is "a 'special relationship' between the plaintiff and the defendant that creates a duty owed by the defendant").

The plaintiffs assert that they "placed their confidence in [Ocwen] and that confidence was betrayed." (Bolding omitted.) They appear to rely, therefore, upon the doctrine that "[a] fiduciary relationship has been defined as a comprehensive term and exists wherever influence has been acquired and abused or confidence has been reposed and betrayed." Lash v. Cheshire County Savings Bank, 124 N.H. 435, 438 (1984) (quotation and brackets omitted). In Lash, for instance, we held that a jury reasonably could have found a breach of fiduciary duty where the defendant bank "retained the plaintiffs' funds, disbursed them without authorization, and [then] demand[ed] that the plaintiffs repay the loan." Id. at 439. Lash made clear, however, that "[i]n doubtful cases, whether the conduct of two parties was such that a fiduciary relationship existed between them is a question of fact for the trier of fact." Id. at 438.

Here, the trial court found that the plaintiffs "neither alleged, nor put forth evidence showing, that [Ocwen] assumed a duty beyond that traditionally associated with a money lender." Specifically, it concluded:

> [N]either the plaintiffs' allegations, nor the record viewed in the light most favorable to them, supports a finding that Ocwen engaged in any extra contractual conduct giving rise to an independent duty. There is no evidence that Ocwen acquired influence over the plaintiffs outside of the contractual relationship and thereafter abused it or that the plaintiffs' confidence was otherwise reposed and then betrayed. Indeed, there is no evidence that the plaintiffs and Ocwen ever communicated with one another at any time.

(Citation omitted.)

The plaintiffs challenge the trial court's final statement, asserting that "[t]here were factual allegations in the pleadings that the plaintiffs did communicate with Ocwen on th[e] very subject [of overpayment]." They do not, however, refute the trial court's crucial finding that there was "no evidence that Ocwen acquired influence over the plaintiffs outside of the contractual relationship." Indeed, they appear to rely solely upon the contractual relationship in arguing that a special relationship existed, asserting that they "did repose their confidence in Ocwen by entering into a mortgage with [it]." (Emphasis added.) Accordingly, the plaintiffs have failed to show that the trial court erred in discerning no support for finding an extra-contractual duty in this case.

4

The plaintiffs also attempt to fit this case within the ambit of a line of New Hampshire precedent "impos[ing] a duty on [a] mortgagee to exercise good faith and due diligence in certain situations." With one exception — namely, Lash, 124 N.H. at 439, which we addressed above — the cases cited by the plaintiffs involved foreclosure by the mortgagee. See First NH Mortgage Corp. v. Greene, 139 N.H. 321, 323 (1995); Wheeler v. Slocinski, 82 N.H. 211, 212 (1926). In that situation, we have held mortgagees executing a power of sale to a duty that is "essentially that of a fiduciary" under the "often-repeated rule that a mortgagee executing a power of sale is bound both by the statutory procedural requirements and by a duty to protect the interests of the mortgagor through the exercise of good faith and due diligence." Murphy v. Financial Development Corp., 126 N.H. 536, 540-41 (1985). We note, as did the trial court, that Ocwen is not the mortgagee itself, but the mortgagee's loan servicer. Nevertheless, for ease of analysis, we will assume, without deciding, that Ocwen stands in the shoes of the mortgagee (U.S. Bank N.A.).

Relying upon the foreclosure cases, the plaintiffs assert that the trial court erred in apparently concluding that "because the redemption situation was contemplated in the contract, . . . any activity with regard to the redemption was contractual in nature." This is so, the plaintiffs argue, because, like the lender's power to redeem here, "[t]he power of sale is generally included in a mortgage instrument." Be that as it may, however, the plaintiffs fail to persuade us to recognize an "essentially . . . fiduciary," id. at 541, duty on the part of a mortgagee exercising its contractual right to redeem the mortgaged property as we have on the part of a mortgagee exercising its contractual power of sale. They argue:

> The common thread in the cases in which a fiduciary duty is imposed is that the mortgagee is, in some way, acting on behalf of the mortgagor by authorization from the mortgage. . . . Generally speaking, when a bank is "spending" a borrower's money, or increasing its debt, or at least not mitigating the amount due as in a foreclosure, then the bank has taken on an act as a sort of "trustee" for the borrower. In those instances, the laws and courts impose a duty upon the lender.

Assuming, without deciding, that the plaintiffs have identified a "common thread" in these cases, we disagree that "acting on behalf of the mortgagor by authorization from the mortgage" is, by itself, enough to justify the imposition of an extra-contractual duty as a matter of law.

Ocwen argues, to the contrary, that "the policy behind imposing such a fiduciary duty [on a foreclosing mortgagee] is to curb the possibility that a mortgagee-bank might act in its own self-interest at the expense of the mortgagor-borrower." We agree that it is the conflicting or divergent interests at play in a foreclosure sale that necessitate the imposition of an "essentially

5

. . . fiduciary" duty "to protect the interests of the mortgagor." Murphy, 126 N.H. at 540-41. Accordingly, we examine those interests, and those involved in this case, to determine whether to extend the foreclosure sale line of cases to the situation presented here.

The mortgagor has the right to have the proceeds of the sale first credited against the mortgagor's debt, see Carrols Equities Corp. v. Della Jacova, 126 N.H. 116, 119 (1985), and then to receive "all the proceeds of the sale above the amount necessary" to repay the debt in full, Wheeler, 82 N.H. at 212. Thus, the mortgagor has an interest in maximizing the price at which the property is sold. The foreclosing mortgagee, however, has no reason to promote that interest; it "has the right to sell the property for the payment of the mortgage debt," Wheeler, 82 N.H. at 212, but it has no incentive to obtain a higher price. Nor, certainly, is the mortgagor's interest protected by the purchaser, who seeks to buy the property as cheaply as possible, and who has the lawful right to do so. Id. at 214. Thus, the interests of the mortgagor and the purchaser are directly adverse, as we have noted when the mortgagee itself is a potential purchaser. See Murphy, 126 N.H. at 541 (recognizing the "conflicting interests involved" when a foreclosing mortgagee occupies "dual role[s] as seller and potential buyer at the foreclosure sale"); Wheeler, 82 N.H. at 214 (noting that "[t]he situation created by the statute authorizing the mortgagee to buy . . . permit[s] the exercise of personal interest conflicting with fiduciary duty"). In addition, the mortgagee's ability to control the sale heightens the risks to the mortgagor's interest. See Wood River Development v. Armbrester, 547 So. 2d 844, 847 (Ala. 1989) (noting that when a "mortgagee is selling the property, . . . his interest is diametrically opposed to the interest of the mortgagor, especially if he is the purchaser of the property at the foreclosure sale" because he "is in a better position to hinder the sale and render it self-serving"); cf. Wheeler, 82 N.H. at 213 (noting that the mortgagee "had control over the conduct of the auction, and in such control represented the mortgagor as well as himself"). Thus, foreclosure under power of sale presents the mortgagee with an opportunity to profit at the mortgagor's expense by buying-in at less than fair value (perhaps even by manipulating the circumstances of the foreclosure sale itself) and then reselling the property at a higher price.

The situation in this case did not present similarly conflicting interests. Ocwen paid an additional, out-of-pocket sum of money merely to retain and protect the security interest it had already been given, and thereby activated a promise by the plaintiffs to repay the additional amount advanced, with interest, but also subject to the attendant risk of default. Ocwen had little incentive to pay more than the actual amount of fees due and did not stand to profit unfairly at the plaintiffs' expense.

Furthermore, we agree with Ocwen that the contractual and other legal constraints already imposed upon its "discretionary authority" make "recognition of a fiduciary duty in this context . . . unnecessary." In particular,

6

Ocwen points to language in the mortgage authorizing the lender to "do and pay for whatever is <u>reasonable or appropriate</u> to protect Lender's interest in the [Unit]" (emphasis added), and to the implied covenant of good faith and fair dealing recognized by New Hampshire law "[i]n every agreement," <u>Birch Broad. v. Capitol Broad. Corp.</u>, 161 N.H. 192, 198 (2010). Ocwen concludes, and we agree, that "[i]n light of the . . . contractual[] . . . language and the existing implied covenant of good faith and fair dealing, to the extent that the [plaintiffs] argue [Ocwen] did not act in a 'reasonable or appropriate manner,' the contract itself provides a basis for relief." Accordingly, we affirm the grant of summary judgment in favor of Ocwen.

The plaintiffs next challenge the trial court's denial of their motion to amend their complaint to more particularly state their previous claims and to add new claims and new parties. Our standard of review is well-settled: "Amendment of pleadings is liberally permitted, and the decision to grant or deny a motion to amend rests in the sound discretion of the trial court. We will not overturn that decision unless it is an unsustainable exercise of discretion." <u>Kalil v. Town of Dummer Zoning Bd. of Adjustment</u>, 159 N.H. 725, 729 (2010) (citations omitted). Thus, to prevail, the plaintiffs "must demonstrate that the ruling was unreasonable or untenable to the prejudice of [their] case." <u>Id</u>.

The plaintiffs' motion to amend, as the trial court noted, sought to "add claims for intentional misrepresentation, negligent misrepresentation, and breach of contract against the Associations," as well as "to add several new parties for these claims, including individual board members of the Associations." With respect to the new misrepresentation claims, the court noted that "the plaintiffs concede [they] are 'new causes of action.'" The court concluded that the statute of limitations had run on both of the new claims, and, accordingly, denied the plaintiffs' motion as to those claims.

With respect to the breach of contract claim, the court found that it was "a technical, rather than substantive, amendment in which the plaintiffs seek to clarify and/or correct the deficiencies in their existing count to enforce the stipulated agreement." The court indicated that it "would have been inclined to permit" amendment if it "[h]ad . . . been brought sooner," but concluded that "permitting the proposed amendment [would be] neither just nor reasonable" given the plaintiffs' unexplained delay in bringing it. Accordingly, the motion to amend was also denied as to that claim. The plaintiffs challenge both rulings.

We first address the court's ruling that the new misrepresentation claims are barred by the statute of limitations. The motion to amend was brought on March 14, 2016, and the applicable limitations period is three years. <u>See</u> RSA 508:4, I (2010) (three-year statute of limitations applicable to all personal actions other than libel or slander).

The plaintiffs argue that the claims are not barred because, under the discovery rule, the statute of limitations did not begin to run until December 2014. The plaintiffs concede that, because the defendants met their burden to show that this action was not brought within the applicable statute of limitations, the plaintiffs bore the burden to prove the applicability of the discovery rule to their claims. See Glines v. Bruk, 140 N.H. 180, 181 (1995). They assert that they met that burden.

> The discovery rule is a two-pronged rule requiring both prongs to be satisfied before the statute of limitations begins to run. First, a plaintiff must know or reasonably should have known that it has been injured; and second, a plaintiff must know or reasonably should have known that its injury was proximately caused by conduct of the defendant. Thus, the discovery rule exception does not apply unless the plaintiff did not discover, and could not reasonably have discovered, either the alleged injury or its causal connection to the alleged negligent act.

Beane v. Dana S. Beane & Co., 160 N.H. 708, 713 (2010) (quotations and citations omitted). The discovery rule does not require "the full extent of the plaintiff's injury [to have] manifested itself" or that a plaintiff "be certain of th[e] causal connection [between the harm he has suffered and the defendant's negligent or wrongful act]; the possibility that [the causal connection] existed will suffice to obviate the protections of the discovery rule." Id. (quotation omitted). Thus, "that the plaintiff could reasonably discern that he suffered some harm caused by the defendant's conduct is sufficient to render the discovery rule inapplicable." Id. (quotation omitted).

The trial court found that the "alleged misrepresentations . . . were made in March of 2012" and that the plaintiffs knew of them "[a]t the very latest, . . . when they brought a related contempt motion on August 29, 2012." The plaintiffs contend, however, that "[t]he events in 2012 should not be the focus for an analysis . . . [of] the discovery rule exception." Specifically, they argue that although "the overpayment occurred [in 2012], [and] thus, the plaintiffs were injured and they were aware of their harm[,] . . . [they] were unaware that the cause of their injury was the misrepresentations of the defendants." They did not discover that "missing critical information," they assert, "until December of 2014 when they finally received discovery that they had been requesting for years." At that time, they "discovered . . . emails containing . . . communications between Ocwen and the Associations which were in direct contradiction to what the Associations had represented to the plaintiffs years earlier." In other words, discovery revealed, according to the plaintiffs, that "the Associations had, unbeknownst to the plaintiffs, been communicating with Ocwen with regard to a payoff amount[,] . . . in plain contradiction to" the Associations' representations that no such communications with Ocwen had occurred.

In essence, the plaintiffs' argument is that they did not know, and reasonably should not have known, that the Associations had misrepresented the extent of their communications with Ocwen in March of 2012, and that such misrepresentation was the cause of their injury, until they obtained, through discovery, copies of the actual e-mails between the Associations and Ocwen in December of 2014. As the Associations point out, however, that contention is belied by the record.

In their petition to "bring forward to enforce the [Stipulated] Agreement and for contempt," dated June 26, 2012, the plaintiffs alleged that "[o]n or about, March [2012], without consent from the [plaintiffs], discussions commenced between Ocwen and the [Associations] regarding the amount owed by [the plaintiffs] to [the Associations], and on or about March 27, 2012, Ocwen paid the [Associations] a total of $43,443.08." (Bolding and capitalization omitted.) The petition also alleged that the plaintiffs "ma[de] inquiries [as] to the amount paid by Ocwen," that they had difficulty obtaining that information, and that by June 22, 2012, the plaintiffs "believ[ed] . . . that the [Associations] were purposefully withholding the breakdown of the $43,443.08." It cited an attached e-mail of that date, from the plaintiffs' counsel to Rolling Green Condominiums' Senior Property Manager, in which counsel stated that he could "only assume that the reason for delay is that Rolling Green is hiding the fact that they requested [Ocwen] pay monies that went beyond the stipulated amount."

The foregoing allegations demonstrate that by the time they brought their petition to enforce the Stipulated Agreement and for contempt, the plaintiffs were aware of the "communications and their secretive nature" that they now argue "caused [them] to enter into [the] Stipulated Agreement without complete knowledge of the facts and the context in which they were doing so." Furthermore, in a letter dated February 25, 2013, still more than three years prior to the March 14, 2016 motion to amend, the plaintiffs' lawyer chided the Associations' lawyer for making "misrepresentations" about his communications with Ocwen:

> It is unclear on how you arrived at the number sent to Ocwen. More importantly, I am disturbed at the misrepresentations that you have made to the Court and . . . myself during the settlement negotiations. Upon documents provided by Ocwen, it is clear that you knew, at the time of negotiating the settlement that you had already provided Ocwen with an amount the check(s) should be made out for.

Even if the plaintiffs did not know the actual content of the communications until, as they allege, December 2014, the discovery rule does not toll the statute of limitations until that date. The plaintiffs' position is substantially equivalent to one we rejected in <u>Bricker v. Putnam</u>, 128 N.H. 162,

9

165-66 (1986). At issue in Bricker was a twelve-page transcript of a portion of the minutes of the May 22, 1969 meeting of the House of Delegates of the New Hampshire Medical Society. See Bricker, 128 N.H. at 163. Bricker sought to review the meeting minutes shortly after the meeting, but was informed they had not yet been transcribed. Id. at 165. In late 1970 or early 1971, he reviewed what would appear, by pagination, to have been the entire minutes, but did not see the twelve pages at issue, which had been filed separately. Id. In 1975, he sought to obtain, by subpoena, all documents relating to him, but "allege[d] that the twelve pages were not produced." Id. Bricker finally "came upon the twelve pages at issue" on May 16, 1978, and contended that the statute of limitations did not begin to run until that date. Id. at 164. We disagreed, explaining:

> Although the actual discovery of the twelve pages did not occur until 1978, the record indicates that Bricker was fully apprised of the substance of the discussion recorded therein shortly after the meeting of the house of delegates in 1969, when a member of the house informed him of everything that had taken place. Thus, it cannot be said that [Bricker] was prejudiced because he was unaware of the cause of his injury or did not know his adversary.

Id. at 166. We concluded that Bricker "did not need the actual minutes to have the facts essential to his cause of action." Id. Similarly, here, the plaintiffs were aware, more than three years prior to March 14, 2016, that the Associations had engaged in payoff "discussions" with Ocwen and had "misrepresent[ed]" the extent thereof. Accordingly, the discovery rule does not toll the statute of limitations on the plaintiffs' misrepresentation claims.

The plaintiffs also cite the fraudulent concealment rule, although it is unclear whether they rely upon it as a separate ground for tolling the statute of limitations. To the extent they do, the Associations contend that argument was not raised before the trial court and is, therefore, not preserved. While the plaintiffs' motion for reconsideration cited only the discovery rule by name, it also asserted that the Associations were "intentionally deceptive" and "intentionally withheld material information from [them]." Accordingly, and particularly where "[t]he discovery rule and fraudulent concealment rule serve [a] common purpose" and entail a similar analysis, id. at 165, we will assume, without deciding, that the plaintiffs preserved a fraudulent concealment argument. Nevertheless, because of the similarities between the discovery and fraudulent concealment rules, the plaintiffs cannot prevail on the latter for the same reasons they cannot prevail on the former.

"[T]he fraudulent concealment rule states that when facts essential to the cause of action are fraudulently concealed, the statute of limitations is tolled until the plaintiff has discovered such facts or could have done so in the exercise of reasonable diligence." Id. As discussed above, and notwithstanding

10

any alleged fraudulent concealment by the Associations, the plaintiffs could have reasonably discerned the cause of their alleged injury more than three years prior to March 14, 2016 — the date they brought their motion to amend. We conclude that here, as in Bricker, "[n]o unfairness has resulted from [the plaintiffs'] failure to discover" the actual e-mails between Ocwen and the Associations. Id. at 167. "The equitable considerations that govern the operation of the discovery rule and the fraudulent concealment rule dictate that these rules not be applied to prevent the running of the statute of limitations in this case." Id. (citation omitted). Having determined that neither the discovery rule nor the fraudulent concealment rule applies to the plaintiffs' new misrepresentation claims, we conclude that their motion to amend was properly denied as to those time-barred claims. See Thomas v. Telegraph Publ'g Co., 151 N.H. 435, 440 (2004) (finding trial court's denial of motion to amend "after the statute of limitations had run" sustainable).

Before addressing the plaintiffs' arguments regarding their breach of contract claim, we first consider the Associations' assertion, on cross-appeal, that the trial court should have granted them summary judgment on the plaintiffs' claim seeking to enforce the Stipulated Agreement because that claim is barred under the doctrine of res judicata. They note that the trial court declined to address the applicability of res judicata to that claim because it had already been dismissed on other grounds. They contend, however, that because the plaintiffs "now seek to revive the enforcement of the Stipulated Agreement claim and the proposed breach of contract/enforcement of Stipulated Agreement claims through this appeal," the applicability of res judicata is once again at issue. They then assert that the trial court's "denial of the Motion to Amend to resurrect such claims may be upheld on these alternative grounds." Accordingly, if we were to agree with the Associations on this issue, the plaintiffs' appeal with respect to their amended breach of contract claim would be rendered moot.

"The doctrine of res judicata prevents parties from relitigating matters actually litigated and matters that could have been litigated in the first action." Gray v. Kelly, 161 N.H. 160, 164 (2010) (quotation omitted). It applies if three elements are satisfied: "(1) the parties are the same or in privity with one another; (2) the same cause of action was before the court in both instances; and (3) the first action ended with a final judgment on the merits." Id.

We need not determine whether the first two elements are satisfied, because we conclude that the third is not. The Associations assert that there was a "final judgment" in the contempt proceeding because the plaintiffs did not appeal the denial of their motion for contempt in which the trial court found, the Associations assert, "that the [p]laintiffs had failed to show a violation of the Stipulated Agreement as a result of the payment by Ocwen." We cannot conclude, however, that the court's order on the motion for contempt was a decision on the merits entitled to preclusive effect. See id. The

11

denial appears to have been granted without prejudice. More broadly, the trial court specifically noted the possibility that another action — "some sort of equitable proceeding" such as "an action for a constructive trust or a fraud action" — could be brought challenging the overpayment by Ocwen. Accordingly, we reject the Associations' contention that res judicata bars the plaintiffs' breach of contract claim.

The plaintiffs next argue, with respect to that claim, that the trial court "erred when it denied [their] request to amend the complaint even though the case was still pending and no final judgment had been made." They contend that ERG, Inc. v. Barnes, 137 N.H. 186 (1993), "requires that a trial court allow plaintiffs at least one opportunity to amend a writ prior to dismissal for failure to state a claim," and note that, with respect to their claim for enforcement of the Stipulated Agreement, the trial court treated the Associations' motion for summary judgment as a motion to dismiss for failure to state a claim and granted it as such. As a whole, then, we interpret the plaintiffs' argument as contending that the trial court erred in imposing a time limit upon their ability to amend under ERG when the deadline imposed by our case law is the entry of final judgment. See Arsenault v. Scanlon, 139 N.H. 592, 594 (1995).

The Associations assert that this argument is not preserved because "the [p]laintiffs did not urge that the [trial court's] decision was contrary to the ERG holding in [their] motion for reconsideration." We agree that ERG is not cited in the plaintiffs' motion for reconsideration; nevertheless, we decline to find the plaintiffs' argument not preserved for appellate review. The trial court was well aware of ERG — it is cited in the court's order. Cf. State v. Gross-Santos, 169 N.H. 593, 598 (2017) ("We have often explained that the purpose of our preservation rule is to insure that trial forums have an opportunity to rule on issues and to correct errors before parties seek appellate review."). Moreover, while the holding of ERG constitutes a subsidiary element of the plaintiffs' argument as we have framed it above, their primary contention is that the trial court erred in imposing an arbitrary deadline — and doing so without prior notification — while the case was still open. That contention is made with sufficient clarity in the motion to reconsider. Accordingly, we consider the plaintiffs' argument preserved and will address it on its merits.

The Associations also argue:

> While the [p]laintiffs asserted that their Motion to Amend, in part, served to correct perceived deficiencies and the [trial court] described the proposed breach of contract claim as a 'technical' rather than substantive amendment, both treated the breach of contract claim as a substantive amendment with their reliance upon RSA 514:9 and the standards thereunder.

We agree that the trial court may have blurred the distinction between technical and substantive amendments when it stated that permitting amendment of the Stipulated Agreement claim would be "neither just nor reasonable." See Pesaturo v. Kinne, 161 N.H. 550, 556 (2011) (distinguishing between the "opportunity to correct perceived deficiencies in [a plaintiff's] original claims" pursuant to ERG, and substantive amendments, which "[a] court need only allow . . . when necessary to prevent injustice"). Nevertheless, the trial court clearly stated that it considered the proposed amendment to be "technical, rather than substantive," and specifically cited ERG for the "well-settled" rule "that plaintiffs are permitted to amend their complaints following dismissal for failure to state a claim." Thus, we conclude that, notwithstanding the manner in which the plaintiffs may have presented or argued their request, the trial court treated the proposal, at least as to the Associations, as a technical amendment under ERG.

The Associations nevertheless argue that the "the proposed breach of contract claim did represent a substantive amendment to the [c]omplaint." They first contend that the proposed breach of contract claim asserted a new cause of action because the original claim for enforcement of the Stipulated Agreement remained in the amended complaint as a renumbered count. Thus, they argue, "the [p]laintiffs did not cure deficiencies so much as they added a new claim." While we again agree that the Associations' argument is factually accurate as to the contents of the original and amended complaints, it elevates form over substance. The trial court noted that it had analyzed the original claim for enforcement of the Stipulated Agreement as a claim for breach of contract. Thus, the trial court correctly viewed the proposed breach of contract claim in the amended complaint as an attempt to "clarify and/or correct the deficiencies in [the plaintiffs'] existing count to enforce the stipulated agreement" rather than a new cause of action. That the original, dismissed count remained in the amended complaint is of no moment.

The Associations also note that the amended complaint sought to assert the breach of contract claim "not only against the Associations, but against officers of the Associations." We agree with the Associations that adding the breach of contract claim against these new parties is a substantive amendment. Thus, to prevail on appeal as to the claims against these parties, the plaintiffs would have to demonstrate that "the trial court could [not] have reasonably found that th[is] substantive amendment[] w[as] not necessary to prevent injustice." Id. at 557. We conclude that they have not done so. Their brief does not explicitly address their breach of contract claims against the new individual defendants and, in fact, it is unclear whether they challenge that aspect of the trial court's ruling. They argue that "[t]he denial of [their] motion to amend their complaint was unreasonable and prejudiced their case in that they were unable to pursue valid claims against the defendant Associations and are left with no recourse against the Associations' wrongdoing." Although the trial court also did not differentiate between assertion of the proposed

breach of contract claim against the new individual defendants, as opposed to the Associations, and, although it analyzed the proposed claim as a technical amendment, it also found that "permitting the proposed amendment [was] neither just nor reasonable." As that finding effectively forecloses approval of a substantive amendment, see id., and the plaintiffs fail to demonstrate that it was an unsustainable exercise of discretion with respect to the individual defendants, we affirm the trial court's denial of the motion to amend as to the breach of contract claim against those defendants.

Returning to the amended claims with respect to the Associations, the Associations next assert that denial of the motion to amend is sustainable because the proposed breach of contract claim in the amended complaint "fails to cure the deficiencies as the [p]laintiffs merely alleged payments of legal fees without tying the same to an action covered by the Stipulated Agreement." The original claim to enforce the Stipulated Agreement alleged that "[a] permanent stipulation was entered into and approved by the Court" and that "[t]he [p]laintiffs are entitled to have the terms of the Stipulation enforced, and that the [Associations] should be bound by such terms." Treating the claim as one for breach of contract, the trial court dismissed it for failure to state a claim, concluding that "the plaintiffs have not cited any provision of the Stipulated Agreement that has been violated."

The proposed breach of contract claim in the amended complaint alleges that the parties entered into the Stipulated Agreement, in which they "agreed that they would be responsible for their own legal fees." It further alleges that "[d]espite the Stipulat[ed] [Agreement], the [Associations], without legal excuse continued to charge the [p]laintiffs legal fees and costs." The Associations appear to contend that this proposed amendment still "fail[s] to cite a provision being violated." We disagree. The Stipulated Agreement consists of thirteen separately-numbered paragraphs set forth on three pages. Although the amended complaint does not identify the allegedly violated provision by paragraph number, the substance of the provision is clearly alleged and is easily found within the three-page document. Accordingly, we conclude that "[t]his claim cured the defect that required dismissal of the plaintiff's initial writ." Lamprey v. Britton Constr., 163 N.H. 252, 265 (2012). "[W]e decline to address, [however,] in the first instance, whether the [plaintiffs'] allegations are reasonably susceptible of a construction that would permit recovery," Sanguedolce v. Wolfe, 164 N.H. 644, 648 (2013) (quotation omitted), or, in other words, whether the claim would survive a motion to dismiss brought upon a ground other than failure to identify the provision alleged to have been violated.

Having found that the plaintiffs' proposed amendment corrected the deficiency that prompted the earlier dismissal, we would ordinarily conclude that "the trial court unsustainably exercised its discretion by dismissing the [breach of contract claim] . . . without giving the plaintiff[s] an opportunity to

14

add the [curative] allegation[s]." Lamprey, 163 N.H. at 265. This case, however, presents the question whether a trial court can deny a curative amendment solely upon the basis of the plaintiffs' delay in bringing the motion to amend.

The trial court noted, and the plaintiffs do not dispute, that if its order on the Associations' motion for summary judgment was a final judgment, "then the Court would not have the ability to allow any amendments as to claims against the Associations as the case would be over." See Arsenault, 139 N.H. at 594. The court considered it "questionable whether [that order] was a 'final judgment' subject to mandatory appeal," but determined that it "need not decide [that] issue." The plaintiffs, however, must establish on appeal that the order was not a final judgment to preclude affirmance on that alternative ground. See, e.g., Doyle v. Comm'r, N.H. Dep't of Resources & Economic Dev., 163 N.H. 215, 222 (2012) (noting that "where the trial court reaches the correct result on mistaken grounds, we will affirm if valid alternative grounds support the decision" (quotation omitted)).

> Generally, when a trial court issues an order that does not conclude the proceedings before it, for example, by deciding some but not all issues in the proceedings or by entering judgment with respect to some but not all parties to the action, we consider any appeal from such an order to be interlocutory . . . .

Germain v. Germain, 137 N.H. 82, 84 (1993). Here, the Associations and Ocwen filed separate motions for summary judgment, which the court decided in separate orders dated August 25, 2015, and April 1, 2016, respectively. The August 25, 2015 order, which disposed of all claims against the Associations, "decid[ed] some but not all issues in the proceedings" and "enter[ed] judgment with respect to some but not all parties to the action," id., leaving claims pending against Ocwen. Thus, where the August 25, 2015 order did not bifurcate the proceedings, it was not a "decision on the merits" for purposes of appeal, but, rather, was interlocutory. Id. (quotation omitted) (concluding that where court bifurcated proceedings, issuing "a divorce decree deciding property issues but leaving child custody and permanent support to be decided after final hearing," that order was a "decision on the merits" for purposes of appeal (quotation omitted)). Accordingly, no "final judgment . . . [terminating] the trial court's power to allow amendment to the [complaint]" was issued or rendered. Arsenault, 139 N.H. at 594.

Having concluded that the trial court had jurisdiction to allow an amendment to the plaintiffs' complaint, we now address whether it unsustainably exercised its discretion by imposing a time limit upon the filing of a technical amendment under ERG. We will assume, without deciding, that a trial court has the authority to impose such a limit. The Superior Court Civil Rules provide that "[a]mendments may be made to the Complaint or Answer

15

upon the order of the court, at any time and on such terms as may be imposed." Super. Ct. Civ. R. 12(a)(4). We will assume that this language means that amendments may be made "at any time" unless the court imposes the additional "term" of a deadline by which to file. Id. We conclude, however, that implicit in the meaning of "on such terms as may be imposed," id., is that the affected party be provided notice of the terms imposed. Cf. People v. Allen, 815 N.E.2d 426, 432 (Ill. App. Ct. 2004) (holding that "it is arbitrary for a court to summarily reject [a plea agreement tendered before trial] as late unless the court told the parties, in advance, what 'late' meant" in that respect; "[t]o fairly and reasonably enforce a deadline for tendering plea agreements, a court must first give the parties advance notice of the deadline").

Here, it appears, and was asserted by the plaintiffs in their motion for reconsideration, that the trial court did not notify the plaintiffs of a time limit for filing a motion to amend. The court's order states:

> The Court generally allows parties thirty days to amend when the complaint fails to state a viable claim. While the Court did not explicitly afford the plaintiffs an opportunity to amend in its August [25], 2015 order, it is well-settled in this State that plaintiffs are permitted to amend their complaints following dismissal for failure to state a claim. See ERG, Inc. v. Barnes, 137 N.H. 186, 189 (1993). The Court therefore presumed that the plaintiffs knew of their right to amend. The plaintiffs, who are represented by counsel, do not now claim otherwise.

We conclude that because the trial court failed to notify the plaintiffs of a deadline for moving to amend their complaint, its denial of their motion to amend on timeliness grounds constituted an unsustainable exercise of discretion. Cf. id. at 431-32 (holding trial court abused its discretion in refusing to consider, on ground of untimeliness, plea agreement tendered on day of trial when court had failed to give parties advance notice of a filing deadline). Accordingly, we reverse the court's denial of the plaintiffs' motion to amend with respect to the breach of contract claim against the Associations.

Finally, the Associations cross-appeal the trial court's denial of their request for attorney's fees. "We give substantial deference to a trial court's decision on attorney's fees, and will not overturn it absent an unsustainable exercise of discretion." Bosonetto v. Town of Richmond, 163 N.H. 736, 746 (2012) (quotation omitted); see also Bianco, P.A. v. Home Ins. Co., 147 N.H. 249, 251-52 (2001) (explaining review of trial court's discretion when an award of attorney's fees is mandated by statute).

The Associations argue that they are entitled to attorney's fees on the basis of the plaintiffs' bad faith conduct, see Harkeem v. Adams, 117 N.H. 687, 690-91 (1977), and under RSA 507:15 (2010) (authorizing award of costs and

reasonable attorney's fees plus $1,000 to prevailing party in contract or tort action if court finds "the action or any defense is frivolous or intended to harass or intimidate the prevailing party").  The trial court, however, implicitly found that the plaintiffs' action was not frivolous, as it noted that "[h]ad the plaintiffs pursued relief under a different legal theory the outcome may have been different."  In addition, the court stated that it was "not unsympathetic to the plaintiffs' plight" and noted, "[i]n particular, [that] it appear[ed] the Associations [had] dodged the plaintiffs' reasonable requests for information. For this reason, the Associations' request for attorney's fees is DENIED."  We interpret this as a ruling that fees were not justified on the basis of bad faith. See In the Matter of Sheys & Blackburn, 168 N.H. 35, 39 (2015) (noting that "interpretation of a court order is a question of law, which we review de novo").

In support of their claim on appeal, the Associations recount a "continuing series of litigation" that the plaintiffs have waged against them, as well as other actions the plaintiffs have taken, in alleged bad faith.  They nevertheless fail to demonstrate, or even argue, that the factual finding underpinning the trial court's ruling — i.e., that "the Associations have dodged the plaintiffs' reasonable requests for information" — is clearly erroneous. Accordingly, we conclude that they have not shown an unsustainable exercise of discretion.  Bosonetto, 163 N.H. at 746.

The Associations also contend that they are entitled to attorney's fees under: (1) RSA 356-B:15 (Supp. 2016), which provides a cause of action for failure to comply with condominium instruments, see RSA 356-B:15, I, and further states that "[t]he prevailing party shall be entitled to all costs and attorneys' fees incurred in any proceeding under RSA 356-B:15, I," RSA 356-B:15, II; and (2) a provision in the TOA's bylaws, which provide that "[i]n any proceeding arising out of any alleged default by an Owner, the prevailing party shall be entitled to recover the costs of the proceeding, and such reasonable attorneys' fees as may be determined by the court."  The Associations contend that the trial court's decision "was clearly untenable or unreasonable as its focus was misplaced."  As we read their argument, the Associations contend that the trial court failed to appreciate that the instant action: (1) "presented a continuing issue on the enforcement of the provisions of the condominium documents and the Associations prevailed below"; and (2) "arose out of prior litigation involving defaults by the [p]laintiffs" and "the Associations were the prevailing party."  As such, the Associations implicitly contend, this action is one for which a prevailing party fee award is a statutory, and a contractual, entitlement.

We need not address this argument further, however, given our reversal — with respect to the breach of contract claim against the Associations — of the order denying the plaintiffs' motion to amend their complaint and our remand of that remaining potential claim for further proceedings.  In other words, it is as yet undetermined, as between the plaintiffs and the

Associations, which will ultimately be the "prevailing party." Thus, consideration of any claim to fees under either RSA 356-B:15, II or the TOA's bylaws would be premature.

<u>Affirmed in part; reversed in part; and remanded</u>.

DALIANIS, C.J., and HICKS and BASSETT, JJ., concurred.

**Eileen Fox,**
**Clerk**